May the priest call. My name is Yixuan Lin. I represent petitioners. In this case, the BIA performed, without opinion, the IJS decision in denying petitioners' application for asylum and withholding of removal. The IJS denial of petitioners' asylum is based upon its adverse credibility finding. The IJS supported its adverse credibility finding for two reasons. First, the IJS adverse credibility was based upon its demeanor observation. Normally, this court gives the IJS special preference in its adverse credibility finding based upon demeanor observation. But in this case, we would urge the court not to give the IJS adverse credibility finding based upon demeanor observation, any difference. Because the IJS, in this case, according to the IJS, the petitioner was sometimes puzzled and confused, and his testimony was haunting. However, the IJS failed to give one single specific instance of when the petitioner was confused and puzzled, and where in the transcript the testimony was haunting. The IJS, in this case, clearly did not comply with the law in this circuit, in which the court has consistently held that generalized statements that do not identify any problems in demeanor are not sufficient to support an adverse credibility finding. In this case, without identifying particular instances of problems in petitioner's demeanor, petitioner has been deprived an opportunity to offer any explanation. He did describe haunting, for example. Demeanor is something not based on the substance of what somebody says, but the manner in which it's said. And so when specifically identified what it was about the manner of the testimony that gave him pause, why shouldn't we take that as being sufficient? Exactly. Yes, Your Honor. But in this case, although the IJS only gave a generalized statement that his testimony was haunting, but the IJS did not point to any particular instances in the transcript to show that the petitioner was haunting. Well, the transcript may not show haunting or long pauses, and the fact that somebody would, say, pause for a long time or stutter at one particular point probably would not be indicative of anything. If it's a pattern where somebody testifies in such a way that they seem not to be relating what they actually know, but trying to remember a story they're supposed to tell, can you point to something specific in the transcript to reflect that? Or is that simply a broader explanation of why it is that the IJS came away with the impression that this person was not telling the truth? Well, in this circuit, the court reveals only the actual reasons relied by the agency. Without giving the court any examples of which version of the petitioner's testimony was troublesome, the court would be left second-guessing the IJS, what reasons actually was relied by the IJS. And also, I must admit that the transcript sometimes shows that the testimony was not that coherent, but that's more of an indicator of poor translation provided in the hearing. The court has held in pareza, master versus IJS, sometimes petitioner provided unresponsive answers. That's circumstantial evidence of a translation problem. I hope the court has some other cases, immigration cases, originating from Guam. We only have one Mandarin interpreter on Guam. If the court compared those transcripts, then the court would be comfortable in finding that it is the interpreter's English rendition that is haunting, not the respondent's petitioner's testimony. And also, the second reason that the IJS relied upon to discredit the petitioner is the counter-reports. I believe this issue has been fully addressed in Zoom versus Ashcroft. That's the additional citation we provided to the court this morning. And the facts in these two cases are identical. Those cases involve one couple who are not legally married at the time when the abortion took place. And those legal judges relied upon the counter conditions to discredit petitioner's claim. I want to go back to the demeanor issue because, you know, on the face of it, he tells a fairly incredible story. And getting a saw, and one night only, while it rains, he saws his way out of the jail and then flees for nine months across China. And then he floats on this boat, et cetera. He tells his story, so the immigration judge is trying to benchmark that against, is he telling the truth? And he makes a funny point. He says, during the proceedings, the respondent has been carefully observed. This has been done with particular care, inasmuch as members of the appellate board may have difficulty conjecturing solely from perusing the written record whether he testified truthfully or whether he lied. Or because of unconscious bias or faulty memory, testified with reverent inaccuracy. And then goes on to say it's been decided that he's not telling the truth with the incidents. And basically, he's making a credibility judgment based on his demeanor that what he's saying isn't the truth. How much more specific does the immigration judge need to get? In previous cases, when the IJ relied upon preliminary observation to support an adverse credibility finding, the IJ at least would have described with some degree of specifics that what was questioned by the IJ. Essentially, as I said earlier, because the IJ did not give the petitioner a notice of what portion of the transcript was questionable, the petitioner was deprived of the opportunity to offer an explanation. So I would hope that the government, the counsel for the government, would give me an example where the petitioner's testimony was holding, and then I can offer a counter-explanation. Let's stop there. Just so I understand, the rule or the principle you'd like us to adopt is if the petitioner is puzzled, as the IJ said, or testifies haltingly, then the IJ should at least link that demeanor with some part of the testimony you're saying. So you have a kind of one-to-one correlation between the demeanor and the event? Yes. The explanations in the record, I think, can be easily available, readily available. One is the translation problem, as I said, but the interpreter, just like me, who is not a native English speaker, so I'm not speaking falsely, but that's not necessary to indicate that I'm speaking less truthfully than Mr. Goldman, who speaks so far better English than I do. You're probably having a lot of trouble in China. You have about a minute and 30 seconds, but would you like to say something about it? Yes, I would. Thank you for your argument. Counsel? Yes. May it please the Court, Donald Kube, your correspondent. Your Honors, putting credibility aside, if I may, because I know the Court wants to hear from me about that. The problem in this case is a near-boyfriend, even covered by the Population Control Amendment. And the Ma case, of course, in this circuit, said that a boyfriend who was traditionally married, which seems to be the most common way to marry in China from all the cases we see, you see more than I do. That's true. About 5,000 a year. Well, I've, by choice, briefed many such cases for the past two years and seen quite a few, and you've seen my briefs. But in my set, when you go to register the marriage, and the cases, this case doesn't, any more than any other case, flesh it out and tell us what that really means. Because sometimes the couple goes before they're traditionally married, sometimes they go afterwards. It seems to be, from the best I can make of it, simply a recordation for the state of your, for official recognition by the state of your traditional marriage. It seems to be the only way I've ever seen the people marry in China. It is not a marriage ceremony. It's a registration before or after the fact. And in Ma, the couple had gone through a traditional marriage, and the court, this court said that that's good enough. That the fact that they were refused registration, albeit that they were underage, didn't matter that it was all part of this population control policy of the Chinese government. In our case today, by marked contrast, there is no claim, there is no indication, that this couple ever traditionally married or married in any other fashion. In fact, the record conclusively shows otherwise. The government raised this issue before the board? I don't, I don't know, Your Honor, whether it was raised or not. And I would, I neglected to tell the court during my last footnote, somehow the word not got in there. And it should have, I should have been saying that Ma is controlling, and somehow it said not controlling, and I apologize for that. I don't recall, Your Honor, whether, yes? No, I'm even more confused. My impression, and perhaps it was the not problem, my impression of that last footnote and the position coming into today was that if we get to that issue because the board didn't speak to it, we should remand under Ventura, which is a position I understand it takes all the time. And now you seem to be addressing the merits of it to suggest that what you're really asking us to do is, we don't need to deal with the adverse credibility determination, we can turn it down based on the fact that we don't have a spouse relationship here, which is exactly what I thought you were telling us not to address, and I should go back to the board under Ventura. So, again, my apologies. If the court wants to remand the case to let the board address that issue. I don't have a problem with that. I know what you're asking for. Yes. Well, I submit that Myers is determinative of the case, but beyond that, if you wish, we can get back to the credibility thing. That was not a finding that stopped the immigration judge, was it? No, it did not. He did not address that. He did not address it, and the board did not address it, de facto having adopted. Yes, it was a streamlined decision. So isn't this one of these things of you basically take the warts of the IJ's decision as you find them, and the board adopted this, and if there's no challenge against it, why would it be appropriate for us to remand? It would be like a second bite of the apple. Well, but for the government, you mean? Yes. And because it wasn't covered, it passes? But the thing is on the other front, they had an issue they thought was dispositive in their favor, and they didn't use it before the board. You would quite appropriately argue to this court that the issue's been laid. They don't get a second bite of the apple. I guess that's the sense of Judgment Day's question. It's certainly something that could be fixed at the IJ level had it been brought to the attention of the board, because they could have said, well, there's a jurisdiction issue. Send it back. We don't have any findings. But we have no record of that anywhere. So it seems to me. Well, I must in candor tell you that. I mean, it might be a good argument. It was either raised or suggested by the petitioner at the hearing. They did file a pre-hearing brief of sorts. They didn't raise it well enough, but they did mention it. Well, I don't think they would be trying to find their way out of a marriage. They were trying to say that Ma covered it, or CYZ covered it, when it obviously didn't. Your position is that the worst case scenario from the government's point of view, because this issue wasn't addressed if we disagree on the credibility that it ought to go back to the board, to look at Ma in the first instance, and that's the sense of Ventura. Yes. Am I? You're absolutely 36 foot. No. You want to talk about ACD? What's that? First Credibility Determination. How is he supposed to say that IJ, he or she, is supposed to identify specifically what it was about the woman and how it ties to the heart of the claim? All right. Was that done here? Not wholly. He dealt, I guess you could say, in more conclusions by saying words like puzzled, confused, hesitant, faulty, etc. Now, page 28 and 29, and I believe I won't belabor it again, but I went into the record and I found numerous instances that I say support those conclusions, and I pointed them out. Not the most significant one, I believe, in my estimation, would be when he refused or was unable to answer where in the world did this claim of being wanted for kidnapping and robbery ever come from? And the judge could not get him to answer that question. And that's the most demonstrable one that I could find. And like I said, many others are listed there with the citations. The question is that obviously as a good reader, you can see some holes in the story. I see some holes in the story, frankly. But the question is, isn't it incumbent upon the immigration judge to say, he's going to say he's puzzled, that doesn't help us, but say he's puzzled, he doesn't seem to be able to explain where the robbery incident came from, or he was totally confused about his dates. He's totally confused, period. So we have nothing to link the alleged murder. I understand, and I'm not arguing with that. If he didn't do it, he didn't do it. So maybe you're agreeing that we should, at least on the credibility, to conclude that through no fault of your own, that I.J. here just didn't tie it up as required under the law. I would say for the most part that's the case. I appreciate your candor. I tried to find for the court the examples he was referring to, and I think I found them. Some are better than others. Can you also distinguish, I mean, there are different kinds of evaluations of credibility based on observation. Some of them go to the substance of what's said, and that you can find, and did find, going through the transcript. And then there are other things that won't be reflected in the transcript at all. One of the problems that an appellate panel always has with demeanor evaluations is demeanor includes a lot of nonverbal things in the transcript. Now, what is the obligation of an I.J. with regard to those nonsubstantive things, where it isn't a matter of not being able to recall dates or explain the circumstances of a robbery, the examples of Judge McKeown, but it's just that you start twitching in a certain way, the kind of things that human beings think that you can tell by looking at somebody. What is the I.J. supposed to do to make a record about the basis for you, To make a better record, he should have done what Judge McKeown specified or articulated. He should have linted out in some manner so that you would know. And that's what's missing for the most part. The consequence of this, in your view, would be a grant of the petition or a remand? A remand, Your Honor. I would think, if I could just have a half minute. There's one other, I try to point out in the briefs, I won't repeat the things that, whether the immigration judge relied on it or not didn't make sense or didn't add up or there were indications, so far so to say, that indicate whether or not someone is making something up or exaggerating something or telling the truth that every trial judge looks for in hearing a witness. And the one thing that the judge did articulate was that there's an abortion certificate. And the control report, it carefully always points out that in these documents coming out of Fujian, in southern China, there's a tremendous amount, they're very questionable. And the investigations at the consulate level have confirmed that problem. And there is no abortion certificate. And it's funny that the consulates on the ground, on the scene, can't find them. And yet we see them time after time in asylum claims before this court. The only certificate the consulate is aware of is one that is more or less, perhaps like the one in this record and in other records, which is given when the abortion is voluntary so that the woman can demand two weeks of leave. There is no known certificate for an involuntary abortion. Thank you. You have a little more than a minute. Okay. We just want to encourage you to use that. It looks like we may have a settlement. And I wouldn't object to the government suggesting that we have to call an agreement in this case to the BIA for further development of the record. But one thing that I would ask the court to address is that the IJ in this case is not a fair-minded and neutral fact finder. And this is my belief that at the very beginning of my client's testimony, that he said his girlfriend was forced to have a mid-term abortion. So it's very hard for me to believe your story. I think the hostile attitude exhibited by the IJ, that might have something to do with my client's position was confusing because he was disconcerted by the IJ's attitude toward him. And did their client request that ruling? No, Your Honor. But this is a constitutional issue, something that just occurred to me. Obviously, it might be, Your Honor. But it's a constitutional issue. And the petitioner came with a constitutional issue for the first time with this court. And the BIA lacks jurisdiction to review a constitutional issue. We understand that. You're out of time. Thank you, Your Honor. Thank you, Your Honor.
judges: Hawkins, McKeown, Clifton